# IN THE COURT OF APPEALS OF THE STATE OF WASHINGTON

## DIVISION II

| | |
|---|---|
| STATE OF WASHINGTON, | No. 51376-5-II |
| Respondent, | |
| v. | |
| CLINTON JAMES CALDWELL, | UNPUBLISHED OPINION |
| Appellant. | |

MELNICK, J. — Clinton Caldwell appeals his convictions for assault in the second degree and felony harassment, both of which carried domestic violence allegations as defined in RCW 10.99.020.[1] The charges arose after Caldwell and a woman went on a date and spent the night together. During the night, Caldwell became violent.

Caldwell first argues that the trial court erred in admitting evidence that he lied to the arresting police officers by telling them that the victim had raped him. He next challenges the jury's findings of domestic violence. He argues that insufficient evidence supports the jury's finding or, in the alternative, that the statute defining "dating relationship," RCW 26.50.010(2), is unconstitutionally vague. Finally, Caldwell argues that the trial court erroneously imposed legal financial obligations (LFOs).

We affirm the convictions but remand for the trial court to reconsider the imposition of LFOs.

---

[1] Recently, the legislature enacted substantial changes to many statutes to address domestic violence. LAWS OF 2019, ch. 263. These amendments impacted many statutes cited throughout this opinion. We cite to the versions of the statutes in effect at the time of Caldwell's crimes.

FACTS

Caldwell met Kaitlin Pappas through an online dating website. They exchanged messages through the website every day for two weeks. They decided to meet in person and set up a date.

Caldwell and Pappas met at a restaurant in Sumner. They each ate and had an alcoholic drink. Afterwards, they decided to go to the Tacoma waterfront. On their way, Caldwell and Pappas stopped at a bar and had another drink.

At Caldwell's suggestion, Pappas parked her car at his house. Caldwell then took Pappas inside to meet his mother.

They proceeded to the waterfront area. They took an elevator to a bar on the top floor of a building. In the elevator, Caldwell kissed Pappas. Caldwell and Pappas went to other bars and had more drinks. They were seen leaving one of the bars with their arms around each other.

Caldwell and Pappas then went back to Caldwell's house. Because they had been drinking, Caldwell and Pappas agreed that she would spend the night. They went inside, had sexual intercourse, and fell asleep.

Pappas awoke to Caldwell peeing on the floor and wall. Caldwell became irritated when Pappas roused him and told him what he was doing. He then jumped on top of her, grabbed her by the neck, and began punching and strangling her. While doing so, Caldwell also yelled at Pappas, threatening to kill her. Two more incidents of violence occurred before Pappas successfully escaped Caldwell's house.

Once outside the house, Pappas called the police. She ran away, and shortly thereafter, the police picked her up and took her to the hospital. The police went to Caldwell's house and arrested him.

Caldwell appeared intoxicated. He seemed agitated, slurred his speech, appeared to lack coordination, and smelled like alcohol. The police also noticed what appeared to be urine on the carpet of Caldwell's bedroom.

The police had a ride-along passenger with them. After being placed in the police car, Caldwell thought this person was Pappas and yelled at her. Caldwell also repeatedly exclaimed that Pappas had raped him.

Due to the allegations of rape, the police took Caldwell to the hospital. At the hospital, Caldwell admitted that Pappas had not raped him.

The State charged Caldwell with assault in the second degree and felony harassment. Both charges carried domestic violence allegations.

Caldwell pleaded not guilty, and the case proceeded to trial. Before trial, Caldwell moved to exclude, among other evidence, statements made by him that Pappas had raped him. Caldwell argued that, because the evidence would only be used to prove his intoxication on the night of the incident, the prejudicial nature of the evidence outweighed its probative value. The court ruled that the evidence was admissible. Specifically, the court ruled that the evidence was relevant as to Caldwell's "intoxicated state and state of mind," and that its unfair prejudice did not substantially outweigh its probative value. Clerk's Papers (CP) at 87.

In the same order, the court ruled that other statements and actions made by Caldwell to the police were inadmissible because the unfair prejudice for those pieces of evidence substantially outweighed their probative value. For example, the court excluded evidence that Caldwell attempted to kick out the window of the police vehicle while he was claiming that Pappas had raped him.

Before beginning their deliberations, the court provided the jury with an instruction defining "dating relationship." It also instructed the jury on voluntary intoxication.

The jury found Caldwell guilty of both counts and also returned special verdicts that the crimes were domestic violence incidents. The court sentenced Caldwell and imposed numerous LFOs on him, including a $200 criminal filing fee. The court also ordered that interest accrue on the financial obligations until paid in full. Caldwell appeals.

## ANALYSIS

### I. EVIDENCE ISSUE

Caldwell argues that the trial court abused its discretion in admitting allegations of rape because the evidence's "slight probative value . . . was vastly outweighed by its prejudicial impact." Br. of Appellant at 10. Caldwell contends that "[t]he testimony was only marginally helpful in establishing [his] intoxication and anger" and that other evidence sufficiently established intoxication. Br. of Appellant at 10. Caldwell claims that the evidence was unfairly prejudicial because it painted him as a liar. We disagree with Caldwell.

We review trial court decisions to admit evidence for an abuse of discretion. *State v. Perez-Valdez*, 172 Wn.2d 808, 814, 265 P.3d 853 (2011). "'A trial court abuses its discretion if its decision is manifestly unreasonable or based on untenable grounds or untenable reasons.'" *State v. Scherf*, 192 Wn.2d 350, 387, 429 P.3d 776 (2018) (quoting *In re Marriage of Littlefield*, 133 Wn.2d 39, 46-47, 940 P.2d 1362 (1997)). Additionally, we may uphold a trial court's decision on any basis supported by the record and the law. *State v. Kelley*, 64 Wn. App. 755, 764, 828 P.2d 1106 (1992).

Under ER 403, relevant evidence "may be excluded if its probative value is substantially outweighed by the danger of unfair prejudice." Evidence may be unfairly prejudicial when it excites an emotional rather than a rational response by the jury or when it promotes a decision on

4

an improper basis. *State v. Haq*, 166 Wn. App. 221, 261, 268 P.3d 997 (2012). The trial court has considerable discretion to consider what evidence is relevant and to balance its possible prejudicial impact against its probative value. *State v. Barry*, 184 Wn. App. 790, 801, 339 P.3d 200 (2014).

In admitting evidence that Caldwell claimed Pappas had raped him, the trial court ruled that the evidence was relevant to show both Caldwell's level of intoxication and his state of mind.

Caldwell's intoxication and state of mind were at issue. Caldwell was charged with assault in the second degree and felony harassment, and thus, to convict Caldwell the State was required to prove that Caldwell "intentionally" assaulted Pappas and that he "knowingly" threatened her while doing so. RCW 9A.36.021; RCW 9A.46.020. Caldwell claimed that he was too intoxicated to form the requisite intent and asked for a voluntary intoxication jury instruction, which the court gave.

Thus, in admitting the evidence, the court recognized that the evidence of Caldwell's rape allegation was relevant to show both Caldwell's intoxication and that he was not so intoxicated that he could not have "intentionally" assaulted Pappas or "knowingly" threatened her. The court properly weighed the probative value of admitting Caldwell's rape allegation against its prejudicial effect and exercised its discretion to admit this evidence while excluding other evidence.

For example, the court excluded evidence that, at the time he was claiming that Pappas had raped him, Caldwell attempted to kick out the window of the police car. This evidence was highly prejudicial because it was indicative only of Caldwell's intoxication as it related to aggression, not his state of mind.

The court carefully balanced the evidence under ER 403. It excluded the majority of the evidence regarding Caldwell's arrest but admitted evidence of Caldwell's rape allegation and retraction. The court did not abuse its discretion in admitting this evidence.

II.    SUFFICIENCY OF THE EVIDENCE

Caldwell argues that insufficient evidence supports the jury's finding that he was in a "dating relationship," as was required to establish that his crimes were domestic violence incidents.[2] We disagree.

To determine whether sufficient evidence supports a conviction, we view the evidence in the light most favorable to the State and determine whether any rational fact finder could have found the elements of the crime beyond a reasonable doubt. *State v. Engel*, 166 Wn.2d 572, 576, 210 P.3d 1007 (2009). "In claiming insufficient evidence, the defendant necessarily admits the truth of the State's evidence and all reasonable inferences that can be drawn from it." *State v. Drum*, 168 Wn.2d 23, 35, 225 P.3d 237 (2010).

RCW 9.94A.525(21) relates to calculating offender scores for felony domestic violence offenses "where domestic violence as defined in RCW 9.94A.030 was pleaded and proven." "Domestic violence" involves crimes, including assault in the second degree, "committed by one family or household member against another." RCW 10.99.020(5); *see* RCW 9.94A.030(20). The definition of "family or household members" includes "persons sixteen years of age or older . . . who ha[ve] or ha[ve] had a dating relationship." RCW 10.99.020(3). RCW 10.99.020(4) provides that the definition of "dating relationship" is the same as that in RCW 26.50.010.

Here, the court instructed the jury:

> "Dating relationship" means a social relationship of a romantic nature. In deciding whether two people had a "dating relationship," you may consider all relevant factors, including (a) the nature of any relationship between them; (b) the length of time that any relationship existed; and (c) the frequency of any interaction between them.

---

[2] Caldwell recognizes that no Washington cases discuss the requisite quality or quantity of contacts but points to California and Illinois case law for the proposition that it takes more than one date to establish a dating relationship.

CP at 66.  The instruction followed the statute.  RCW 26.50.010(2).

Viewing the evidence in the light most favorable to the State, we conclude that a rational jury could have found that Caldwell and Pappas were in a dating relationship.

Caldwell and Pappas communicated every day for two weeks through a dating website. Online dating relationships are becoming increasingly prevalent.  When they met for an in-person date, Caldwell and Pappas went to multiple locations in Pierce County and displayed overt signs of affection, including holding each other around the waist.  Caldwell also introduced Pappas to his mother.  At the conclusion of the evening, Caldwell and Pappas then went to Caldwell's home and engaged in sexual intercourse.

Accordingly, sufficient evidence supports the jury's finding.  Viewing the facts in light of the three statutory factors, and others, supports the jury's finding Caldwell and Pappas were in a dating relationship when Caldwell committed his acts of domestic violence.

III.     VAGUENESS

Caldwell argues that the statute defining "dating relationship," RCW 26.50.010(2), is unconstitutionally vague.  We disagree.

Due process under the Fourteenth Amendment of the United States Constitution and article I, section 3 of the Washington Constitution requires citizens to have fair warning of what conduct is prohibited by law.  *State v. Bahl*, 164 Wn.2d 739, 752, 193 P.3d 678 (2008).  A statute is unconstitutionally vague if it (1) "'does not define the criminal offense with sufficient definiteness that ordinary people can understand what conduct is proscribed,'" or (2) "'does not provide ascertainable standards of guilt to protect against arbitrary enforcement.'"  *State v. Halstien*, 122 Wn.2d 109, 117, 857 P.2d 270 (1993) (quoting *City of Spokane v. Douglass*, 115 Wn.2d 171, 178, 795 P.2d 693 (1990)).

As discussed above, a "dating relationship" is defined as "a social relationship of a romantic nature," and a jury may consider three or more factors when making its determination. RCW 26.50.010(2).

In *State v. Nguyen*, 191 Wn.2d 671, 683, 425 P.3d 847 (2018), the court held that the term "dating relationship" in a community custody condition does not render the condition unconstitutionally vague. The court's analysis involved two parts. The court distinguished the terms "dating relationship" and "significant romantic relationship" on the basis that the latter included impermissible "highly subjective qualifiers" like "significant" and "romantic," while "dating" is more definite. *Nguyen*, 191 Wn.2d at 682-83.

The court also relied on the fact that "dating relationship" is defined in RCW 26.50.010(2). *Nguyen*, 191 Wn.2d at 682. According to the court, the definition's factors allowed persons of ordinary intelligence to understand what the law proscribes. *Nguyen*, 191 Wn.2d at 682. Even though the definition itself contains the word "romantic," which the court described as an impermissible "highly subjective modifier," the court did not so much as hint that, as a result, the definition was unconstitutionally vague. *Nguyen*, 191 Wn.2d at 682-83. Similarly, we conclude that the statute is not unconstitutionally vague.

IV.     LFOs

Caldwell argues, and the State agrees, that because of the 2018 amendments to the LFO statutes we should strike the $200 criminal filing fee and interest-accrual provision of his judgment and sentence.

We accept the State's concession and remand for the trial court to reconsider the imposition of LFOs. On remand, the trial court should consider all of the LFOs in light of the 2018

amendments to the LFO provisions, LAWS OF 2018, ch. 269, and *State v. Ramirez*, 191 Wn.2d 732, 426 P.3d 714 (2018).

We affirm the convictions but remand for the trial court to reconsider the imposition of LFOs.

A majority of the panel having determined that this opinion will not be printed in the Washington Appellate Reports, but will be filed for public record in accordance with RCW 2.06.040, it is so ordered.

Melnick, J.

We concur:

Maxa, C.J.

Sutton, J.