IN THE COURT OF APPEALS FOR THE STATE OF WASHINGTON

| | | |
|---|---|---|
| STATE OF WASHINGTON, | ) | No. 77515-4-I |
| | ) | |
| Respondent, | ) | DIVISION ONE |
| | ) | |
| v. | ) | UNPUBLISHED OPINION |
| | ) | |
| DARYL H. RHODES, | ) | |
| | ) | |
| Appellant. | ) | |
| | ) | FILED: July 29, 2019 |

ANDRUS, J. — Daryl Rhodes seeks the dismissal of two second degree burglary charges, contending he was denied his speedy trial rights in violation of CrR 3.3 and the federal and state constitutions. Rhodes also challenges the late post-appeal entry of findings of fact and conclusions of law by the trial judge who presided over his bench trial.

We conclude the trial court did not abuse its discretion in continuing Rhodes' trial under CrR 3.3(f)(2). It properly documented the reason for each and every continuance, and it properly excluded certain time periods from Rhodes' time-to-trial computation when required to do so. Thus, the trial court did not violate Rhodes' right to a speedy trial. We also conclude that Rhodes suffered no prejudice by the late entry of the trial court's findings and conclusions. The findings

were not tailored to address errors raised in Rhodes' opening brief. We therefore affirm.

## FACTS

The State charged Rhodes with two counts of second degree burglary on December 2, 2016. The charges arose from two burglaries that occurred within a week of each other at the same tea shop. According to the probable cause certification, the police publicized surveillance footage from the shop leading to the identification of Rhodes as the suspect. When arrested, Rhodes possessed suspected burglary tools, including a distinctive pry bar and flashlight observed in the surveillance footage.

At his December 14, 2016 arraignment, the trial court set Rhodes' trial date as February 1, 2017, and, as required by CrR 3.3, set his time-to-trial deadline as February 12, 2017.

On January 17, 2017, the parties agreed to continue the trial one week, over Rhodes' objection, so Rhodes' burglary charges would track with a separate case in which Rhodes was charged with third degree assault. The trial court extended the time-to-trial expiration date to March 8, 2017, noting that the continuance was granted "upon agreement of the parties" under CrR 3.3(f)(1).[1]

---

[1] It is unclear whether Rhodes argues on appeal that the trial court erred in granting any continuances that his counsel agreed were necessary or sought on Rhodes' behalf. Rhodes did object to every continuance, but his counsel did not. Because our Supreme Court has held that defense counsel has the authority to make binding decisions to seek continuances over the objection of his client, State v. Ollivier, 178 Wn.2d 813, 825, 312 P.3d 1 (2013), none of the continuances to which defense counsel agreed or which defense counsel sought may be the basis for a speedy trial violation.

On January 27, 2017, the trial court permitted the State to amend the information to add a third count of second degree burglary, based on a new referral arising out of a burglary that occurred at the University of Washington during the same period as counts 1 and 2. According to the probable cause certification for count 3, the University of Washington police discovered a burglary of a campus building in which laptops and other electronics were stolen. They discovered pry marks on doors and latent fingerprints from a desk. The police identified the fingerprints as those of Rhodes. There was no video surveillance footage for this burglary.

The State requested a trial continuance to provide new discovery to Rhodes. Over defense counsel's objection to joining the third burglary charge to the case, the trial court continued the trial date to February 13, 2017, finding on the record that the continuance was necessary in the administration of justice and imposed no prejudice on the defendant. The court made no change to the time-to-trial deadline.

Rhodes' counsel then moved for a trial continuance on February 9, 2017, again over Rhodes' objection, indicating he needed more time to investigate count 3, including potentially retaining an out-of-state fingerprint expert and moving to sever count 3. Defense counsel noted that the severance motion would hinge on the strength or weakness of the State's case on count 3, and he needed more time to make a complete record. The court spoke to Rhodes regarding his objection but concluded good cause existed to grant the continuance. The court noted, "I have experienced trial counsel telling me that he's not going to be able to properly

defend Mr. Rhodes to this new allegation." The trial court granted a trial continuance to March 6, 2017, and reset the time-to-trial expiration date to March 25, 2017.

On February 27, 2017, Rhodes' counsel moved for another continuance as he was still working to retain an expert. Defense counsel indicated he also needed to interview the State's fingerprint experts on all three counts. He represented to the court that "all of that work that needs to be done implicates the defendant's [Sixth] Amendment right to effective counsel." Counsel also stated that Rhodes was being held in custody on two other cases, including the third degree assault charge, which he believed would be tried first. He argued there was no prejudice to Rhodes in allowing counsel more time to prepare. The trial court granted the continuance request, finding it to be required in the administration of justice and finding no prejudice to Rhodes. The trial court continued trial to March 23, 2017, and set a new time-to-trial expiration date of April 22, 2017.

On March 10, 2017, defense counsel asked for a third short continuance. Counsel notified the court that for strategic reasons, Rhodes no longer intended to retain any expert, but he still needed time to interview witnesses and prepare his motion to sever count 3. Because the prosecutor had a scheduled vacation, the parties agreed the best date for the severance motion would be March 24, requiring them to push the trial date to March 27, 2017.

Once again, the trial court found good cause to continue trial over Rhodes' objection for two reasons. First, it found that his "very experienced trial lawyer – your counsel needs to interview some witnesses." Second, counsel sought to

move to sever count 3 from the first two counts. The court explained to Rhodes that this approach "may help you in the long run. I can't say, but he thinks it might. So this is an important strategic decision he's making on your behalf, which he's allowed to do." The court granted a four-day continuance to March 27, 2017, and extended the time-to-trial deadline to April 26, 2017.

Rhodes delivered his motion to sever to the prosecutor on March 23, 2017. On March 24, 2017, the State moved to continue the hearing on this motion, and by necessity the trial date, because it did not receive the motion until the day before the scheduled hearing. Rhodes' counsel did not object, but informed the court that Rhodes did. Counsel noted he had only had 60 days in which to prepare for count 3, which was based primarily on fingerprint evidence. The trial court explained to Rhodes that his counsel wanted to file a motion to sever one of the burglary counts, and the reason for doing so was "he thinks it's going to hurt your chances at trial" if all three counts were tried together.

The trial court found good cause to continue the trial date to allow the parties to prepare for and argue the severance motion. It found that Rhodes suffered no prejudice because he was awaiting trial on the third degree assault charge,[2] a case scheduled to proceed to trial first. The trial court continued trial to April 5, 2017. The court did not change the time-to-trial deadline.[3]

---

[2] These charges were dismissed on April 3, 2017.

[3] During the March 24 hearing, the trial court orally found good cause to continue the trial date to April 5, to allow counsel to file the motion to sever, and the court set the hearing on the motion to sever for April 3.

The trial court heard Rhodes' motion to sever on April 3, 2017. Rhodes argued that trying count 3 with the first two burglary charges prejudiced him because the identifying evidence from counts 1 and 2 increased the likelihood for conviction on count 3, for which the evidence against Rhodes was much weaker. The court denied the motion on April 5, 2017.

Between April 5 and May 18, 2017, the trial court set Rhodes' case on the standby trial calendar. But the court had to continue the trial date 22 times due to either judicial or trial counsel's unavailability. These continuances were documented by written orders but no hearings occurred. In each of these written orders, the court documented that the motion to continue was brought by the court and indicated the reason for the trial continuance. If the continuance was caused by the lack of judicial availability, the time-to-trial date remained the same. In other words, the trial court determined that the period of judicial unavailability was not an excluded time period under CrR 3.3(e). If the continuance resulted from "Plaintiff's counsel in trial," or "Medical leave for DPA," or "Defense counsel in trial," the court found the continuance was necessary in the administration of justice under CrR 3.3(f)(2).

On May 18, 2017, the parties appeared before the trial court to address the State's motion to continue the trial date to May 24, to accommodate the prosecutor's prescheduled vacation. The court again found the continuance to be required in the administration of justice and no prejudice to the defendant and granted the continuance, extending the time-to-trial deadline to June 24, 2017.

Between May 24 and June 15, 2017, the trial court again administratively continued Rhodes' trial date eight more times due to judicial and trial counsel unavailability. Once again, if the basis for the trial continuance was the lack of an available judge to try the case, the trial court did not extend the time-to-trial deadline. If the basis for the continuance was the unavailability of either the prosecutor or defense counsel, the trial court found the continuance to be necessary for the administration of justice and not prejudicial to Rhodes under CrR 3.3(f)(2). The last order of continuance, entered on June 14, 2017, continued Rhodes' trial to June 15, 2017, but retained the time-to-trial expiration date of July 12, 2017.

On June 15, 2017, the court assigned Rhodes' case to a judge for trial. When the parties appeared before the trial judge, they discussed scheduling issues and realized the prosecutor had a scheduled, non-refundable statewide conference to attend the following week that might interfere with the completion of the trial. Defense counsel suggested severing count 3 to allow time to complete trial on the first two counts before the prosecutor's leave. When the trial court suggested a bench trial on the first two counts, defense counsel stated "[w]e would love a Bench Trial [o]n Counts 1 and 2." The State agreed to proceed in this manner. The trial judge decided to revisit Rhodes' severance motion, granted it, and started trial on the first two charges that same day.

At trial, the State played the surveillance footage during the tea shop owner's testimony. The State also presented evidence from Seattle Police Officers Wesley Buxton and Christopher Perry.

Officer Buxton responded to Kung Fu Tea Shop on September 15, 2016, after its owner called in a break-in. Officer Buxton saw that the cash register was missing and that cables had been cut. He watched the surveillance video but did not dust the tea shop for fingerprints.

Officer Perry responded to the second burglary at Kung Fu Tea Shop on September 22, 2016. Officer Perry saw an empty stand on top of a cash drawer where an iPad used for a cash register would have been prior to the September 15, 2016 burglary. Officer Perry also testified that the door leading to the management room, which was normally locked, had been pried open. The intruder, later identified as Rhodes, took a dagger, a laptop, and some new gym clothes during the September 22, 2016 burglary. After watching the surveillance video in the management room, Officer Perry collected fingerprints from various items in the tea shop, including the cash register. He also gathered items next to the cash register that he saw the suspect touch in the video to process for prints.

Detective Ronnie Traverso viewed the surveillance video from both burglaries. Because of the video's clarity, Detective Traverso captured a still photo from it to use in a department bulletin. Other officers recognized Rhodes as the burglar in the photo. Detective Traverso compared a prior booking photo to the surveillance footage and concluded the person in the tea shop was Rhodes.

At that time, the University of Washington Police Department contacted Detective Traverso to tell him Rhodes was in their custody. UW police sent Detective Traverso photos of the property Rhodes possessed when he was arrested. Detective Traverso recognized two of the items from the surveillance

footage—a pry bar and a flashlight. Detective Traverso testified that the pry bar had the same sticker on it that he could see in the video. He also testified that Rhodes was carrying the distinctive metal flashlight with a rounded end that he saw in the surveillance video.

Amanda Poast, latent print examiner with the Seattle Police Department, also testified. Of the seven fingerprints submitted by Officer Perry, there was only one of value,[4] and Poast excluded Rhodes as the source of that print. When processing other items Officer Perry submitted, Poast identified a palm print from a cardboard box as belonging to Rhodes based on his prints in the AFIS database system and fingerprints she took from Rhodes in court in association with this case. According to Poast, two other latent print examiners with the department verified these results. The trial court overruled Rhodes' counsel's numerous objections as to the admissibility of Poast's testimony, ruling that the objections went to the weight, and not the admissibility, of her testimony.

The trial court found Rhodes guilty on both counts on June 20, 2017. In its oral ruling, the trial court stated that even excluding the fingerprint evidence, it would still conclude Rhodes committed both burglaries. Moreover:

> I would probably be loath to state as a trier of fact that I've got nothing else but the fingerprint evidence, and, therefore, I find beyond a reasonable doubt that it's been proven. I think under the circumstances that would be a dangerous conclusion to reach with nothing more.
>
> . . . .

---

[4] For a print to be "of value," an examiner needs to "see enough clear detail that would make it identifiable." If the print is low quality and does not have enough identifiers in the pattern, that print would not be of value because it would not have enough distinguishable features to match to a known source.

. . . I think Ms. Poast was being very candid. I think she probably does endeavor to do a good job. But I think she also candidly admitted she can't say with 100 percent certainty anything. . . .

. . . .

So fortunately for us -- or, maybe unfortunately for Mr. Rhodes -- the fingerprint evidence isn't it. That's -- it's a little bit of a side show, in essence. Because what I have here -- and I gotta admit -- these are high quality video shots. I -- usually this stuff is junk[,] . . . [but] these images are probably the best I've ever seen.

And for what it's worth, I can't help but say they're this gentleman. They're great shots. And it's -- would be impossible for me to say it's not him. I suppose there's that outside purely speculative[] notion that he's got an evil twin out there. But I think I'd have to rely on complete conjecture to get there, and it's not within the evidence at this point in time.

. . . .

The other thing is, for better or for worse, when the gentleman's arrested he's got a backpack full of the same tools. . . . When you look at the imagery that's provided by the video, you look at the -- the tools that were clearly shown in the video, the tools that were recovered from his backpack when he was arrested. And then if you just kinda want to add on, for whatever it's worth, the fingerprints seem to confirm it, too.

There's no way around saying beyond a reasonable doubt that this gentleman was the one who did both burglaries. I -- I wish there was something I could say to Mr. Rhodes that gave him some hope. But it's -- this is about as -- this about as bulletproof as these cases come.

. . . .

So I'm going to find him guilty of both burglaries. . . . But the bottom line is, I think even discounting the fingerprint evidence completely, you know, the imagery, the tools that were recovered from him on arrest, that alone would be more than enough for me to say beyond a reasonable doubt.

The trial court instructed the State to draft findings of fact. There was over a year's delay in the entry of these findings of fact and conclusions of law. The

State presented proposed findings for the trial court's consideration after Rhodes filed his opening brief in this appeal.

On September 19, 2017, a jury acquitted Rhodes of count 3. On October 3, 2017, the trial court sentenced Rhodes to a prison-based drug offender sentencing alternative (DOSA). Rhodes appeals.

## ANALYSIS

### A. CrR 3.3

A defendant who is detained in custody must be brought to trial within 60 days of arraignment. CrR 3.3(b)(1), (c)(1). Generally, a charge not brought to trial within the time limits of CrR 3.3 must be dismissed with prejudice. CrR 3.3(h). CrR 3.3(e), however, identifies time periods the trial court may exclude from the 60-day time-to-trial computation. One of the exclusions is any "[d]elay granted by the court pursuant to section (f)." CrR 3.3(f)(2) gives the trial court the discretion to grant a continuance on motion of the court or a party "when such continuance is required in the administration of justice and the defendant will not be prejudiced in the presentation of his or her defense." If a period of time is excluded from the time-to-trial computation, then "the allowable time for trial shall not expire earlier than 30 days after the end of that excluded period." CrR 3.3(b)(5).

The focus of Rhodes' speedy trial argument relates to the trial delay caused by the unavailability of the prosecutor and a trial judge. He argues the trial court violated CrR 3.3 by excluding these delays from the time-to-trial computation and repeatedly extending his speedy trial deadline between April 4, 2017 and June 15, 2017.

We review an alleged violation of the speedy trial rule de novo. State v. Kenyon, 167 Wn.2d 130, 135, 216 P.3d 1024 (2009). However, we review the trial court's decision to grant a continuance for abuse of discretion. Id. (quoting State v. Downing, 151 Wn.2d 265, 272, 87 P.3d 1169 (2004)). Once a continuance is properly granted, the trial court has discretion in selecting the new trial date. State v. Flinn, 154 Wn.2d 193, 200-01, 110 P.3d 748 (2005). A court abuses its discretion if its decision is manifestly unreasonable, based on untenable grounds, or based on untenable reasons. Kenyon, 167 Wn.2d at 135.

1. Prosecutor's Unavailability

Rhodes argues the trial court erred in repeatedly continuing his trial and extending the time-to-trial deadline because the prosecutor assigned to the case was in a different trial, on vacation, or on medical leave. He contends this type of unavailability is not excludable under CrR 3.3(e)(8) because it is neither unavoidable nor unforeseen. But the trial court did not rely on CrR 3.3(e)(8) when it extended Rhodes' time-to-trial deadline. The court, instead, relied on CrR 3.3(f)(2).[5] Thus, the only question is whether the trial court abused its discretion in finding the continuances were required by the administration of justice under CrR 3.3(f)(2). We conclude no abuse of discretion occurred here.

First, a trial court may consider a prosecutor's scheduling conflicts when deciding whether to grant a continuance. Flinn, 154 Wn.2d at 200; see also State v. Heredia-Juarez, 119 Wn. App. 150, 153, 79 P.3d 987 (2003) (prosecutor's

---

[5] At oral argument, Rhodes argued CrR 3.3(f)(2) allows a trial continuance but does not permit the trial court to extend the time-to-trial deadline. We disagree with this assertion. CrR 3.3(e)(3) clearly excludes delays granted by a court under CrR 3.3(f) from the time-to-trial computation.

scheduled vacation is valid basis for granting continuance). Second, the phrase "administration of justice" is not limited to the administration of justice in a single case seen in isolation from others awaiting trial. State v. Angulo, 69 Wn. App. 337, 343, 848 P.2d 1276 (1993). "It is the trial court's responsibility to assure a speedy trial for all criminal defendants." Id. The court can therefore properly consider the factors affecting all defendants whose cases are scheduled to go out for trial in deciding whether a continuance should be granted under CrR 3.3(f)(2).

King County Local Criminal Rule 1.1 provides that the current procedures for handling and processing criminal cases in King County Superior Court are contained in the Criminal Department Manual, available in the Chief Criminal Judge's Courtroom and online.[6] The Criminal Department Manual explains its trial assignment process:

> In assigning cases for trial, the court will endeavor to give priority to cases where time will expire under the speedy trial rule, to in-custody defendants over out-of-custody defendants, to earlier-filed cases over later-filed cases, to cases involving interpreters, to cases where defendant has never waived his or her right to a speedy trial, and to cases with witness availability and other scheduling limitations.[7]

When an attorney is assigned to trial, his or her other cases are put on standby status.[8] After a case is placed on standby, the "Criminal Department staff closely monitors all standby cases. As soon as an attorney clears, the standby case is

---

[6] KING COUNTY, WASH., LOCAL RULES OF THE SUPERIOR COURT FOR KING COUNTY CrR 1.1 (rev. Sept. 1, 2018), available at https://www.kingcounty.gov/courts/clerk/rules/LCrR_1o1.aspx.

[7] KING COUNTY, WASH., KING COUNTY SUPERIOR COURT CRIMINAL DEPARTMENT MANUAL § 17.2 (rev. Mar. 2019), available at https://www.kingcounty.gov/~/media/courts/superior-court/docs/criminal/criminal-manual.ashx?la=en.

[8] Id. at § 17.3.

immediately assigned to a judge by the Criminal Department staff."[9]  When an attorney is scheduled for trial for more than one case, the court gives priority to that attorney's cases with in-custody defendants; cases with the earliest arraignment dates; co-defendant cases; cases with attorney, interpreter, or witness availability problems; and cases with the earliest time-to-trial expiration date.[10]

Viewing Rhodes' case in light of these procedures, we find no abuse of discretion in the trial court prioritizing its criminal cases in this fashion and determining that a prosecutor's unavailability due to a higher-priority trial necessitated a continuance in Rhodes' case.

Rhodes next argues the trial court should not have granted repeated continuances without doing so on the record.  Rhodes suggests the trial court entered orders of continuance on the court's own motion without his knowledge.  First, CrR 3.3(f)(2) permits the court to continue the trial date on its own motion.  Second, the King County Superior Court Criminal Department Manual explains that if the attorney does not conclude another trial and become available, the Criminal Department staff will prepare an order continuing the trial, stating the reason for the continuance, and will present the order to the Chief Criminal Judge for signature.[11]  This manual gives ample notice to the parties that if a case is on standby, and one of the attorneys remains in trial, the court will enter an order of

---

[9] Id.

[10] Id.

[11] Id.

continuance without going on the record to do so. This procedure was followed in Rhodes' case. We find no abuse of discretion in following this procedure.

Rhodes also argues that under State v. Chichester, 141 Wn. App. 446, 170 P.3d 583 (2007), the trial court should have determined on the record that reassignment to another prosecutor was not feasible. But Chichester does not mandate such an inquiry.

In Chichester, during a trial-setting hearing on a Friday, the State indicated it was available for Chichester's DUI trial the following Wednesday and Thursday. Id. at 449. The trial court relied on this representation when setting the trial schedule for multiple cases. Id. at 454. Only after the court had organized its trial calendar, involving at least seven other cases, did the State inform the court that it lacked enough prosecutors for all the scheduled trials. Id. The court stated it was disinclined to grant a continuance given the State's earlier representation that it was ready for trial and suggested the State find "some alternatives." Id. at 450.

The following Wednesday, the date set for Chichester's trial, the prosecutor requested a continuance because there was "one prosecutor and one prosecutor only" available to handle all of the trials scheduled to start that day. Id. at 449-51. One of the two prosecutors present insisted she was there only to supervise the other in his first trial, per office policy. Id. at 451. Chichester objected to any further delay because he lived over 100 miles away, had no driver's license, and had to arrange to have a friend drive him to trial in Bellevue. Id. at 449, 452. The trial court denied the State's requested continuance, and when the State indicated it

was not ready to proceed to trial, the trial court dismissed the case, finding any further delay would be prejudicial to Chichester. Id. at 453.

On appeal, this court held that "[w]hen a prosecutor is unavailable due to involvement in another trial, a trial court generally has discretion to grant the State a continuance unless there is substantial prejudice to the defendant in the presentation of his defense." Id. at 454. In exercising this discretion, the trial court may consider many factors, including "surprise, diligence, redundancy, due process, materiality, and maintenance of orderly procedure." Id. (quoting Downing, 151 Wn.2d at 273).

We concluded that several factors supported the trial court's discretionary decision to deny the State's motion to continue, "particularly the necessity for orderly procedure in the setting of trials." Id. We determined "the trial court acted within its discretion in deciding that maintaining a confirmed trial setting had a higher priority than the prosecutor's office policy" regarding the supervision of new attorneys. Id. The court acknowledged there is "no per se requirement for the State to reassign a case when the originally assigned prosecutor becomes unavailable," but the trial court may consider whether reassignment is feasible and necessary in a particular situation. Id. at 455. We found no abuse of discretion by the trial court in determining reassignment was feasible and necessary to avoid prejudice to Chichester. Id.

Although Chichester gives the trial court the discretion to determine if reassignment is feasible, it by no means requires the court to do so. As Chichester recognized, there is no affirmative duty to reassign in every case in which a

prosecutor's schedule conflicts with a defendant's speedy trial rights. Heredia-Juarez, 119 Wn. App. at 155. And unlike Chichester, there is no indication in this record that Rhodes' ability to defend himself was impacted in any way by the continuances. We find no abuse of discretion in continuing Rhodes' time-to-trial deadline based on the prosecutor being in another trial.

Finally, we find no abuse of discretion in the continuances resulting from the prosecutor's illness or vacations. A counsel's illness "may be an unavoidable and unforeseen circumstance beyond the control of the court or the parties as well as a circumstance justifying delay 'in the administration of justice.'" State v. Greene, 49 Wn. App. 49, 55, 742 P.2d 152 (1987). And although not unforeseen, vacations are unavoidable due to the pressure and stress of the job. State v. Kelley, 64 Wn. App. 755, 764-67, 828 P.2d 1106 (1992); see also State v. Torres, 111 Wn. App. 323, 331, 44 P.3d 903 (2002) ("Scheduled vacations of counsel justify a continuance."). Thus, these continuances were also within the trial court's discretion to grant.

### 2. Judicial Unavailability

Rhodes next argues the trial court erred in continuing his trial due to judicial unavailability without explaining on the record why no trial judge was available to try his case. Under Kenyon, judicial unavailability cannot be the basis for extending a defendant's time-to-trial deadline without the court explaining the efforts it made to locate an available judge or courtroom. 167 Wn.2d at 139. But here, the trial court did not exclude from the time-to-trial computation any delay caused by judicial unavailability. Neither Kenyon nor CrR 3.3(f)(2) requires an on-

the-record explanation for a trial continuance if the expiration date remains the same. Indeed, the rule explicitly provides the "court must state on the record or in writing the reasons for the continuance." CrR 3.3(f)(2). The trial court complied with this rule by specifying the reasons for each and every continuance, either on the record during a hearing at which Rhodes was present or in a written order of continuance.

Given the trial court's broad discretion in addressing continuances and the absence of any prejudice, we hold the trial court did not abuse its discretion in granting the continuances in Rhodes' case. The proper continuances extended the time-to-trial deadline, and Rhodes' trial commenced before the expiration of that deadline. Accordingly, we hold that the trial court did not violate the time-to-trial requirements under CrR 3.3.

B. Constitutional Right to Speedy Trial

Rhodes also claims the trial delays violated his constitutional right to a speedy trial under the Sixth Amendment and article I, section 22 of the Washington Constitution. Our review of constitutional questions is de novo. State v. Ollivier, 178 Wn.2d 813, 826, 312 P.3d 1 (2013).

While CrR 3.3's purpose is to ensure a defendant's constitutional right to a speedy trial, compliance with the rule does not necessarily mean that no constitutional violation has occurred. Id. at 823. Article I, section 22 of the Washington Constitution provides the same protection as the Sixth Amendment of the United States Constitution. Id. at 826. Because some "pretrial delay is often 'inevitable and wholly justifiable,'" courts must evaluate constitutional speedy trial

delays on a case-by-case basis. State v. Iniguez, 167 Wn.2d 273, 282, 217 P.3d 768 (2009) (quoting Doggett v. United States, 505 U.S. 647, 656, 112 S. Ct. 2686, 120 L. Ed. 2d 520 (1992)).

Barker v. Wingo, 407 U.S. 514, 530, 92 S. Ct. 2182, 33 L. Ed. 2d 101 (1972), established a balancing test that examines the conduct of both the State and the defendant to determine whether constitutional speedy trial rights have been denied. See also Ollivier, 178 Wn.2d at 827; Iniguez, 167 Wn.2d at 283.

> Among the nonexclusive factors to be considered are the "[l]ength of delay, the reason for the delay, the defendant's assertion of his right, and prejudice to the defendant." None of these factors is sufficient or necessary to a violation. But they assist in determining whether a particular defendant has been denied the right to a speedy trial.

Ollivier, 178 Wn.2d at 827 (alteration in original) (citations omitted) (quoting Barker, 407 U.S. at 530)). Before reaching the Barker balancing test, courts must determine if the length of the delay is presumptively prejudicial. Ollivier, 178 Wn.2d at 827. This cannot be quantified by a specific time period. Iniguez, 167 Wn.2d at 283.

Rhodes has failed to show that the delay was presumptively prejudicial under Ollivier. Here, there was a 4.5 month delay in Rhodes' trial,[12] and Rhodes was in custody that entire time. But Rhodes was also in custody on a charge of third degree assault that was not dismissed until April 3, 2017. Moreover, two months of this delay occurred with defense counsel's consent or at defense counsel's request. See Ollivier, 178 Wn.2d at 824 (defendant waives objection to delay where defense counsel requests continuances). Thus, the actual delay was

---

[12] At arraignment, trial was set for February 1, 2017, and trial began on June 15, 2017.

only 10 weeks, from April 5, the date on which defense counsel was prepared to proceed to trial, and the date of trial, June 15. Rhodes points to no decision in which a court has held that a 10-week delay is presumptively prejudicial. Therefore, his constitutional right to a speedy trial was not violated.

C. Constitutional Right to Be Present

Next, Rhodes argues that the trial court denied his right to appear in person and object to the continuances. We reject this argument. First, Rhodes was present to object whenever the court held a hearing to consider a motion to continue his trial. Second, Rhodes' presence was not constitutionally required when the trial court continued his trial due to the unavailability of trial counsel or a trial judge.

Criminal defendants have a fundamental right to be present at all critical stages of a trial. State v. Irby, 170 Wn.2d 874, 880, 246 P.3d 796 (2011). "A 'critical stage' is one at which the defendant's presence 'has a relation, reasonably substantial, to the fulness of his opportunity to defend against the charge.'" State v. Houston-Sconiers, 188 Wn.2d 1, 29, 391 P.3d 409 (2017) (quoting Irby, 170 Wn.2d at 881). But the right is not absolute, and defendants do not have a right to be present where their presence would be useless. Irby, 170 Wn.2d at 881. Rhodes' constitutional right to be present is a question of law reviewed de novo. Id. at 880.

Relying on Irby and State v. Rupe, 108 Wn.2d 734, 743 P.2d 210 (1987), Rhodes argues all of the continuance orders should have been entered in open court with him present. Neither case supports this argument. In Irby, the Supreme

Court held that an email exchange between the court and counsel in which they decided which jurors to disqualify was a part of jury voir dire and constituted a critical stage of the trial at which a defendant has a federal and state constitutional right to be present. 170 Wn.2d at 881-82, 885. Irby did not address a defendant's right to be present when a trial court orders a trial continuance of a few days or less because of judicial or counsel's unavailability.

Rupe is also inapposite. In that case, after the Supreme Court reversed Rupe's death sentence and remanded the case for a new sentencing hearing, a jury sentenced Rupe to death a second time. 108 Wn.2d at 738. On subsequent appeal, Rupe argued that his right to counsel was violated by the trial court's failure to appoint an attorney for him until two weeks before the resentencing trial was scheduled to start. Id. at 741. But Rupe did not establish that his appointed counsel ever officially withdrew, so he had counsel throughout the proceedings. Id. The Supreme Court did note that neither defense counsel nor Rupe was present when the trial court initially reset the trial date. Id. But it determined Rupe was not prejudiced by this action because his attorney moved to continue the trial and the court granted this motion. Id. at 742. The new trial date was set when defense counsel was present. Id. The Supreme Court did not hold that the defendant had a constitutional right to be present when the trial date was set.

The more analogous case is In re Personal Restraint of Benn, 134 Wn.2d 868, 920, 952 P.2d 116 (1998), in which the Supreme Court concluded that Benn did not have a right to be present during a hearing on a motion for a continuance. It reasoned that his absence did not affect his opportunity to defend the charge

because the motion "involved no presentation of evidence, nor was the purpose of the hearing . . . to determine the admissibility of evidence or the availability of a defense or theory of the case." Id.

Here, the record establishes Rhodes was present with counsel whenever any hearing occurred. And while the trial court entered a significant number of continuance orders off the record, under Benn, Rhodes' absence did not violate any constitutional right. No evidence was presented and no decisions were made regarding the admissibility of any evidence or of the availability of any defense.

Under CrR 3.3(f)(2), courts are required to "state on the record or in writing the reasons for the continuance." The orders of continuance and the hearing transcripts explain the reason for every continuance. See Greene, 49 Wn. App. at 55 (continuance may be upheld as long as trial court makes a record of the proceeding and the reasons for the continuance). Thus, Rhodes' citation to State v. Saunders, 153 Wn. App. 209, 220 P.3d 1238 (2009), to imply that there was not an adequate factual basis sufficient for appellate review for his case is not supported by the record. Id. at 220-21 (several continuances granted without sufficient reasoning, and with no progress between continuances, violated defendant's CrR 3.3 speedy trial right). We conclude Rhodes' right to be present at all critical stages of his trial was not violated when the trial court entered orders administratively continuing his trial date due to judicial or counsel's unavailability.

D. Constitutional Right to Public Trial

Rhodes also argues that even if the continuance orders were not a critical stage of his trial, entering the orders without a hearing violated his right to a public

trial. The Sixth Amendment of the United States Constitution and article I, section 22 of the Washington Constitution protect a defendant's right to a public trial. State v. Sublett, 176 Wn.2d 58, 70-71, 292 P.3d 715 (2012). Whether a defendant's public trial right has been violated is a legal question reviewed de novo. State v. Jones, 185 Wn.2d 412, 421, 372 P.3d 755 (2016).

To determine whether a proceeding implicates the defendant's public trial right, Washington courts apply the experience and logic test. Id. Under the experience prong, the court asks "whether the place and process have historically been open to the press and general public." Sublett, 176 Wn.2d at 73. Under the logic prong, the question is "whether public access plays a significant positive role in the functioning of the particular process in question." Id. (internal quotation marks omitted). Rhodes must prove both prongs to establish that a particular proceeding must be open and, thereby, establish his right to a public trial was violated. Jones, 185 Wn.2d at 422-24.

Here, experience and logic suggests no public trial right was implicated. Rhodes' case was put on standby on April 5, 2017 and remained in that status until May 18, 2017, when the court conducted a hearing to address the prosecutor's request for a continuance due to a prescheduled vacation. The court granted the continuance to May 24, 2017, and the case was once again on standby from that date to June 15, 2017. Rhodes has not cited any authority for the proposition that hearings to address the court's decision to place a case on standby or to continue the trial for a few days or less—granted because counsel or a trial judge were unavailable—have historically been open to the public. See State v. Moore, 178

Wn. App. 489, 504, 314 P.3d 1137 (2013) (continuance motion hearings are not hearings at which defendant's appearance is required under CrR 3.4(a)).

Rhodes argues that under State v. Easterling, 157 Wn.2d 167, 178, 137 P.3d 825 (2006), public hearings for trial continuances would hold the court accountable for unjustifiable delays, and that under State v. Striker, 87 Wn.2d 870, 877, 557 P.2d 847 (1976), trial delays and courtroom congestion are historical concerns of the public.

Neither case addresses the experience and logic test in the context of hearings to enter orders of continuance. In Easterling, the Supreme Court held the trial court erred in closing the courtroom to Easterling and the public during a hearing on a motion to sever filed by Easterling's codefendant. 157 Wn.2d at 170-71. Easterling involved a substantive motion to sever trials where a courtroom closure was requested by one of the defendants, not an administrative scheduling order. In Striker, the Supreme Court recognized that the "public has an important interest" in seeing defendants tried in a timely manner. 87 Wn.2d at 876-77. But the statement was made in the context of a defendant's argument that his speedy trial rights had been violated, not in the context of the public's historical presence during trial scheduling conferences.

We conclude Rhodes' right to a public trial was not violated, and the trial court did not err by entering the written continuance orders off the record.

E. CrR 8.3 Motion to Dismiss

Rhodes also argues the trial court erred by denying his motion to dismiss under CrR 8.3. CrR 8.3(b) provides that the court "may dismiss any criminal

prosecution due to arbitrary action or governmental misconduct when there has been prejudice to the rights of the accused which materially affect the accused's right to a fair trial." We review a trial court's denial of a CrR 8.3(b) motion to dismiss for abuse of discretion. State v. Oppelt, 172 Wn.2d 285, 297, 257 P.3d 653 (2011).

At trial, Rhodes argued that the court should dismiss counts 1 and 2 due to prosecutorial mismanagement. He contended that the State's decision to add the third count a month after arraignment forced Rhodes to choose between his speedy trial rights and effective counsel. The trial court rejected the argument.

On appeal, Rhodes raises different CrR 8.3 arguments. He contends that the prosecutor mismanaged the case by deciding to try other cases ahead of his. He also argues that because three prosecutors worked on Rhodes' case, the State should have assigned this matter to a prosecutor whose trial schedule would not interfere with his speedy trial rights. Rhodes cites no authority for reversing the trial court on alternative grounds not considered below. See State v. Sondergaard, 86 Wn. App. 656, 657-58, 938 P.2d 351 (1997) (declining to reverse trial court on theory that State did not present at trial).

Moreover, CrR 3.3(h) provides that "[n]o case shall be dismissed for time-to-trial reasons except as expressly required by this rule, a statute, or the state or federal constitution." In State v. Kone, 165 Wn. App. 420, 436-37, 266 P.3d 916 (2011), this court held that CrR 3.3(h) prohibits dismissal of a case under CrR 8.3(b) for violation of a defendant's time-to-trial rights unless he can show a violation of CrR 3.3, a statute, or the state or federal constitution. Rhodes has

failed to make this showing. We thus conclude the trial court did not err in denying Rhodes' CrR 8.3(b) motion to dismiss.

F. Lack of Written Findings of Fact and Conclusions of Law

Finally, Rhodes argues his convictions may not stand without adequate written findings. CrR 6.1(d) requires that in "a case tried without a jury, the court shall enter findings of fact and conclusions of law." See State v. Head, 136 Wn.2d 619, 624, 964 P.2d 1187 (1998). The trial court entered written findings of fact and conclusions of law in June 2018, after Rhodes filed his opening appeal brief. The State notified the court and appellate counsel of the entry of these findings and conclusions in its response brief, stating that "the retired trial judge has already signed written findings during the pendency of the appellate briefing process."

This court instructed the State to file a supplemental designation of clerk's papers to include these findings of fact and conclusions of law in the appellate record. Rhodes' appellate counsel moved to strike the findings of fact and conclusions of law on the grounds that the State had not notified appellate counsel of their entry. We denied this motion and granted Rhodes the opportunity to submit a supplemental brief on any issues he identified arising out of the trial court's findings of fact and conclusions of law.

Initially, Rhodes asks us to disregard the late-entered findings of fact and conclusions of law for two reasons. We decline to do so. Rhodes argues that under RAP 7.2(e), the trial court needed this court's permission to enter the findings and conclusions. But Rhodes misreads the court rule. Permission from this court must be sought only if the trial court's determination will change a

decision being reviewed by the appellate court. RAP 7.2(e). Nothing in the trial court's findings of fact and conclusions of law had any bearing on this court's review of whether Rhodes' speedy trial rights were violated. Thus, the trial court did not need to seek this court's permission.

Rhodes also argues the delay in entering the findings of fact and conclusions of law prejudiced him. Rhodes, however, has not established the required prejudice. His appeal did not challenge any aspect of the actual burglary charges, which is what the findings of fact and conclusions of law address. He has not shown any indication that the findings were "tailored" to address any issues he had raised on appeal. See Head, 136 Wn.2d at 624-25. Furthermore, he was permitted to assign error to the trial court's findings and argue his appeal theories through supplemental briefing, further negating any prejudice. State v. Ritter, 149 Wn. App. 105, 109, 201 P.3d 1086 (2009). Thus, we will consider on its merits Rhodes' argument that insufficient evidence supports the challenged findings of fact.

To determine whether sufficient evidence supports a conviction, we view the evidence in the light most favorable to the State and determine whether any rational fact finder could have found the elements of the crime beyond a reasonable doubt. State v. Homan, 181 Wn.2d 102, 105, 330 P.3d 182 (2014). Following a bench trial, our review is limited to determining whether substantial evidence supports the findings of fact and, if so, whether the findings support the conclusions of law. Id. at 105-06. "Substantial evidence" is evidence sufficient to persuade a fair-minded person of the truth of the asserted premise. Id. at 106.

No. 77515-4-I/28

Unchallenged findings of fact are treated as true on appeal, and we review challenges to a trial court's conclusions of law de novo. Id.

Rhodes challenges only two of the trial court's findings:

14. Amanda Poast was able to use the AFIS Database to match the prints taken from Daryl Rhodes after the fingerprint motion. The same prints also matched the palm print left on one of the boxes from Kung Fu Tea Shop.

15. The court finds the testimony of Amanda Poast credible.

He claims these written findings of fact conflict with the trial court's oral ruling. App. Suppl. Br. at 7-8. Specifically, he contends Finding of Fact 15 implies the trial court credited Poast's testimony when the evidence actually showed doubts about the accuracy and validity of fingerprint comparisons. App. Suppl. Br. at 8.

Poast testified that she matched a palm print taken from a cardboard box at the tea shop to Rhodes' known prints in the AFIS database. RP 303, 307-08. She testified that two other print examiners verified the match. RP 308-09. Poast further testified that she personally took Rhodes' fingerprints in court to verify that the prints in the AFIS database were actually his. RP 309-12. According to Poast, the fingerprints she took from Rhodes in court were the "same source" as the ones already in the database. RP 312. Thus, Finding of Fact 14 is supported by substantial evidence.

As for Rhodes' challenge to Finding of Fact 15, we defer to the trial court, as the finder of fact, on issues of credibility. See Homan, 181 Wn.2d at 106; State v. Thomas, 150 Wn.2d 821, 874-75, 83 P.3d 970 (2004). Furthermore, the trial court expressly stated in its oral ruling, which is incorporated into the written

- 28 -

findings of fact and conclusions of law,[13] that "Ms. Poast was being very candid." RP 402. It recognized that she "candidly admitted she can't say with 100 percent certainty anything." RP 402-03. But it went onto say that matching fingerprints with any certainty "requires some training, expertise and experience that the lay people wouldn't have," and that it did not think it was possible for lay people to substitute their judgment for the value of an expert like Poast. RP 403. And while the trial court did not rely solely on the fingerprint evidence or Poast's testimony, it stated that the fingerprints seemed to confirm the video evidence and the items Rhodes had in his possession to make this "about as bulletproof as these cases come." RP 403-04. Taken together, these statements support the finding that the trial court found Poast's testimony credible because she spoke candidly about her findings and candidly responded to Rhodes' counsel's cross-examination, questioning the validity of her fingerprint findings.

Even if these two findings of fact were not supported by substantial evidence, the remaining unchallenged findings of fact amply support the trial court's written and oral conclusions of law. Sergeant Bergin with the UW Police Department was able to identify Rhodes based off the department bulletin Detective Traverso created from the September 15, 2016 burglary footage. By watching the video, Detective Traverso was also able to identify tools used in the burglary that Rhodes had in his possession when he was arrested. And after viewing the surveillance video, the trial court expressly stated in its oral ruling, that

---

[13] A trial court's oral ruling is final and binding when it is formally incorporated into the findings, conclusions, and judgment. State v. Mallory, 69 Wn. 2d 532, 533-34, 419 P.2d 324 (1966).

even if it excluded Poast's testimony or discounted the fingerprint evidence, it still would have concluded that Rhodes committed both burglaries. We conclude the trial court's findings of fact support its conclusions of law.

We affirm Rhodes' conviction for two counts of second degree burglary. The State concedes that in light of State v. Ramirez, 191 Wn.2d 732, 426 P.3d 714 (2018), Rhodes should not be assessed a $100 DNA filing fee because his DNA is already on file with the Washington State Patrol Crime Lab. Thus, we remand solely for the superior court to enter a ministerial order striking Rhodes' DNA fee.

WE CONCUR: